Filed 1/27/26  In re J.C. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G065596 |
| Plaintiff and Respondent, | (Super. Ct. No. 25DP0031) |
| v. | O P I N I O N |
| Y.C., | |
| Defendant and Appellant. | |

Appeal from orders of the Superior Court of Orange County, Daphne G. Sykes, Judge. Affirmed.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

\*       \*       \*

Y.C. (Mother) appeals from the Orange County juvenile court's (the court) jurisdictional and dispositional orders. She raises four arguments on appeal. First, she contends substantial evidence does not support jurisdictional findings that were based on her failure to ensure J.C.'s (Minor) school attendance. Second, she argues substantial evidence does not support the disposition order because the Orange County Social Services Agency (SSA) failed to prove no reasonable means existed short of removal. Third, she claims the court erred by finding SSA exercised due diligence in identifying and locating relatives. Finally, she argues the court erred by finding the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.: ICWA) did not apply because SSA did not satisfy its initial inquiry obligations. We disagree with Mother's contentions and affirm the orders.

FACTS

I.

DETENTION

In January 2025, Minor was taken into protective custody when he was 14 years old. A few days later, SSA filed a petition pursuant to Welfare and Institutions Code, section 300, subdivisions (b)(1), (c), and (g).[1] The petition alleged, inter alia, that Minor called a suicide hotline due to suicidal ideation in December 2024. Minor said he had planned to stand in front of a train and felt suicidal because he and Mother were experiencing homelessness. According to the petition, Minor then took a shower, and Mother became upset when she found out he had called the suicide hotline. Mother demanded Minor leave their motel room and locked him out. Minor

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

called the police who took him to the hospital where he was placed on an involuntary psychiatric hold for seven days.

The petition further alleged Minor was placed on another involuntary psychiatric hold due to suicidal ideation in January 2025. Minor's medical team reported that Minor appeared to be impacted by his lack of housing and that he reported Mother left him alone even though she was instructed to supervise him at all times. A doctor likewise indicated Mother was not cooperative with safety planning or ensuring Minor's safety. Minor noted he occasionally had suicidal thoughts "when the family is out on the streets and 'there is no sign of help.'" According to the petition, Mother was uncooperative and did not allow Minor to be interviewed by SSA. Minor also missed a scheduled mental health appointment while in Mother's care.

The petition next alleged Mother was unable or unwilling to provide consistent housing for Minor. Mother and Minor were without housing for over a year and stayed in motels or on the streets as opposed to shelters. Different agencies allegedly offered housing resources to Mother, but she did not follow up or refused to use shelters with rules she did not like.

After a detention hearing, the court detained Minor and placed him at the Orangewood Children and Family Center.

II.

JURISDICTION/DISPOSITION REPORTS

Prior to the jurisdiction/disposition hearing, SSA recommended the court sustain the petition, declare dependency, and provide family reunification services to Mother. Among other things, SSA's reports noted Minor was happy that he had shelter. Minor resumed attending school, and a safety plan was created with school staff regarding his mental health.

3

When asked how he felt emotionally, Minor said it was hard to "bounce[] around from crappy motel to motel, sometimes have to sleep outside, and shoving our resources across the cities." He enjoyed being with Mother when they had housing, but it was "tough" when they were homeless because they had to take turns sleeping to make sure no one took their belongings. He also disclosed that he had missed school on days when he had to help Mother move their belongings due to being homeless. He noted Mother did not do drugs and barely drank any alcohol.

Regarding his suicidal ideations, Minor said he had three or four past incidents with the most recent incident triggered by his homelessness. He physically hurt himself as well and previously took medication for attention deficit hyperactivity disorder. He later reported he had "anxiety and suicidal ideation daily regarding the housing situation for the family as well as . . . [M]other's current situation."

In April 2025, Minor was placed with a foster family where he grew close to the family and enjoyed their time together. In May 2025, Minor reported he was happy and comfortable in his current placement. He also noted he was doing well in school and received an award for improving his grades. When asked what would make Minor comfortable enough to return to Mother's care, he said he "would like for . . . [M]other to have stable housing like an apartment (not going from motel to motel), some form of income, a part-time or full-time job, and some financial stability (savings) for emergencies." He added: "'Housing is not just going to fix the problem because we will still need money to pay rent or else, we will be homeless again.'"

As to Mother, SSA recommended she participate in parent education and individual counseling. She completed the parenting course but

declined individual counseling. Mother reported that she needed stable housing. She initially stayed at a shelter and later in a motel. She also asked SSA for help in finding stable housing so she could reunify with Minor. SSA informed her that it and Project RENEW had already provided housing resources, including temporary shelters, transitional housing, and low-income housing. SSA further reached out to family shelters, but they did not have any availability. SSA also submitted a Bringing Families Home referral for Mother, but the program would not accept supplemental security income (SSI) because a parent had to have part-time or full-time employment. Mother threatened to cancel Minor's services through Project RENEW. She also said she did not have any plans to seek employment because she was waiting for her SSI and Minor's disability case to be reviewed.

With respect to Mother's visits with Minor, SSA reported Mother tried to "guilt" Minor on one occasion for being housed when she was not. The conversation had "a very negative tone." Minor felt pressured by Mother and experienced feelings of guilt. He initially reported the visits were "'getting worse'" because Mother talked about things he did not want to talk about. A few weeks later, Minor reported the visits with Mother were "good," noting they talked and played games. A few months later, Minor reported 40 percent of the time spent during their visits is about him while 60 percent of the time is about Mother. In May 2025, the foster parents noted they were concerned about some things Mother says to Minor because Minor's mood and demeanor sometimes change after the visits.

III.

JURISDICTION/DISPOSITION HEARING

In May 2025, the court began a combined jurisdiction/disposition hearing. SSA's reports were admitted into evidence, and the case worker as

5

well as Mother testified.

When asked if he had any concerns about Minor returning to Mother's care, the case worker testified he was concerned about Mother "advocating for [Minor's] mental health, falling through on mental health services; [Mother] also kind of being a source of support for [Minor] to – enough where he feels like he can be comfortable opening up to her if he's having some of these . . . self-harm thoughts or suicidal ideation." Although the case worker acknowledged homelessness was "not a basis for return or not[,]" he testified homelessness was "directly tied into [Minor's] mental health." He noted Minor had anxiety regarding unstable housing, which also gave rise to "a lot of his self-harm thoughts and . . . suicidal ideation."

The case worker further testified he provided several housing resources to Mother, but none of them worked out. One resource could not accept Mother's application because she did not meet their employment criteria. Minor also apparently told the case worker that Mother took issue with the rules or other things at shelters.

Mother testified she did not know why Minor called the suicide hotline. She also denied asking Minor to leave their motel room after he called the suicide hotline. This was the first time she had learned Minor experienced suicidal ideation. She also testified she was not sure if Minor would benefit from ongoing therapy. When asked why Minor had missed school for a period of time before Thanksgiving through middle of December, Mother testified she had tried to relocate them to a new city but ended up coming back to Anaheim. Mother further testified she was diagnosed with anxiety but did not take any medication for it. She did not want to participate in counseling because she did not think it would help.

As to housing, Mother called different agencies to confirm she was on the list for vouchers, but she did not have a plan for supporting Minor financially or ensuring her own income. She acknowledged she did not have an imminent plan for housing. She also was not looking for employment and intended to only rely on her application for SSI. She had food stamps, cash aid, and Medi-Cal. Finally, she believed she could ensure Minor's school attendance if she had stable housing.

## IV.

### THE COURT'S RULING

After the hearing, the court found an amended version of the petition to be true, declared Minor to be a dependent, and vested custody with SSA with reunification services in place. In making this ruling, the court acknowledged Mother "put her all into . . . rearing" a caring son. The court also emphasized it and SSA were not intervening due to Mother's homelessness. The court explained: "This case is about the stress . . . this condition of prolonged homelessness and instability . . . caused this young man. He has not been able to get the education that he's entitled to under the law. And this housing instability is extremely stressful for [Mother], for adults, and it's even more for stressful for kids because kids are not as developed as adults."

The court continued: "[I]t's a parent's duty to provide for all of the needs of the child. Yes, food and clothing, but also stability and consistent education, and mental health, follow up, follow through. Try as she might, [Mother] has not been able to accomplish this. And it's been months and months; that's why I want to recognize [Mother's] efforts. [¶] But it hasn't been enough, and the young man has really started to suffer because of it.

And the Court's main concern is the child. I have to be concerned with the child first and foremost and what is in his best interest."

Mother filed a timely notice of appeal.

DISCUSSION

I.

THE COURT'S JURISDICTIONAL FINDINGS BASED ON EDUCATIONAL NEGLECT

Mother contends substantial evidence does not support the court's jurisdictional findings that were based on her failure to ensure Minor's school attendance. According to Mother, educational neglect does not establish "a substantial risk . . . [of] serious physical harm" under section 300, subdivision (b)(1). She insists her "responsibility to ensure [Minor] attended school . . . is irrelevant to juvenile court jurisdiction." Finally, she argues the issue is not moot because "reversal of this specific jurisdictional finding would remove a basis for removal, demonstrating a tangible legal consequence." She alternatively requests this court exercise its discretion to reach the merits. We disagree with Mother's latter contentions. The issue is moot, and we decline to exercise our discretion to consider the merits.

"A case becomes moot when events "'render[ ] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief.'" [Citation.] For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).) Thus, "relief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.'" (*Id.* at p. 277.)

Even if an appeal is moot, "courts may exercise their 'inherent discretion' to reach the merits of the dispute." (*D.P., supra,* 14 Cal.5th at p.

8

282.) Our Supreme Court has identified several factors courts may evaluate to decide whether discretionary review of a moot case is warranted. (*Id.* at pp. 285–286.) For example, a court may consider if a jurisdictional finding could impact current or future dependency proceedings. (*Id.* at p. 285.) A court also may consider "whether the jurisdictional finding is based on particularly pernicious or stigmatizing conduct." (*Id.* at p. 285–286.) Finally, a court may consider "why the appeal became moot." (*Id.* at p. 286.)

Here, Mother challenges one jurisdictional finding but does not dispute the remaining sustained allegations independently support jurisdiction. We accordingly must determine whether reversal of the challenged finding would have a "'practical, tangible impact on . . . [Mother's] conduct or legal status.'" (*D.P., supra*, 14 Cal.5th at p. 277.) Mother identifies no such impact. Her sole argument is that she "suffers distinct practical and legal consequences from each allegation" because "[i]t can only be assumed that the reasons stated in the sustained petition – including educational neglect – contributed to the determination that removal was necessary." Regardless, mootness does not turn on whether a challenged finding may have been considered by the court but on whether reversal would alter any operative order or legal effect. Mother does not contend removal would be unwarranted absent the challenged finding. Reversal therefore would not affect jurisdiction or removal, and the issue is moot. (*See In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 ["When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence"].)

We also decline to exercise our discretion to consider this moot

9

issue. Mother generally claims the challenged finding may affect her in future dependency or family law cases. But she does not explain how or identify any concrete, redressable harm. The speculative possibility of future impact is insufficient to overcome mootness.

## II.

### SUBSTANTIAL EVIDENCE SUPPORTING THE COURT'S DISPOSITION ORDER

Mother next argues substantial evidence does not support the court's disposition order because SSA failed to prove no reasonable means existed short of removal. To the contrary, substantial evidence supports the court's disposition order.

### A. *Applicable Law and Standard of Review*

"A dependent child shall not be taken from the physical custody of their parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" there "would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) Removal is also appropriate if there is clear and convincing evidence "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward themselves or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor from the physical custody of their parent . . . ." (§ 361, subd. (c)(3).)

We review the disposition order for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We also bear in mind the clear and convincing standard of proof for a removal order.

B. *Substantial Evidence*

Here, there was evidence that Mother could not tend to Minor's mental health needs. According to an SSA report, she was "unable/unwilling to acknowledge the child's mental health." She had left Minor alone outside at times, including on one occasion after she had been told to ensure he was always supervised due to his suicidal ideation. She also refused service options for Minor and threatened to cancel services that were beneficial to Minor. According to Minor, Mother was angry that he called the suicide prevention hotline and "told him to leave as she could not deal with him anymore." Minor also reported he never talked to Mother about his mental health because he did not want to overwhelm her. Finally, the social worker testified he was concerned Mother would not follow through with mental health services for Minor and that Minor would not be comfortable opening up to Mother about his self-harming thoughts.

There also was evidence that Mother's inability to provide stable housing caused Minor to experience suicidal ideations and mental health problems. A psychiatrist at the hospital noted "the child's mental health is directly connected to his lack of housing." Minor reported he had "anxiety and suicidal ideation daily regarding the housing situation for the family . . . ." He agreed his mental health was affected by living on the streets. He likewise expressed that he wanted Mother to have housing and financial stability before he returned to her care. He noted he missed school on days when he had to move their belongings due to being homeless. Although Mother correctly argues that homelessness is not a reason for removal, there was

11

evidence in the instant case that Minor's housing situation was a primary cause for his suicidal thoughts. As SSA notes, returning him to the same conditions that led to the juvenile court's involvement would place him at risk of serious physical and emotional harm.

Mother argues SSA did not adequately assist her with obtaining housing. To the contrary, SSA connected Mother with various shelters, services, and programs that had housing resources. Mother did not want to comply with the rules of a housing program or attend workshops required by shelters. She also refused to seek employment, which was required for one program. Although none of the housing options were successful, this was not due to any failure on SSA's part.

Mother further questions why money given to the foster family could not have been given to her. She likewise argues SSA did not make reasonable efforts to address her and Minor's poverty because it did not ensure she received child support. She suggests these funds could have helped her secure housing and thereby prevent removal. But Mother points to no authority, and we are aware of none, holding SSA has to provide direct funding to resolve housing issues or must help to resolve child support matters. Regardless, as noted *ante*, removal was not based solely on Mother's homelessness. Minor was experiencing suicidal ideation and required a level of stability Mother was unable to provide at the time of disposition.

In short, the court's disposition order is supported by substantial evidence.

### III.

### SSA'S DUE DILIGENCE IN IDENTIFYING AND LOCATING RELATIVES

Mother further contends the court's finding that SSA exercised due diligence in identifying and locating relatives is not supported by

12

substantial evidence. We are not persuaded.

## A.  *Applicable Law*

Section 309 provides that "[i]f the child is removed, the social worker shall conduct, within 30 days, an investigation in order to identify and locate all grandparents, parents of a sibling of the child, if the parent has legal custody of the sibling . . . [and] other adult relatives of the child . . . ." (§ 309, subd. (e)(1).) Within 30 days of the child's removal, SSA shall provide a written notice containing certain information "to all adult relatives *who are located.*" (§ 309, subd. (e)(1), italics added.)

If the court later removes a child from parental custody at the disposition hearing, it "shall make a finding as to whether the social worker . . . exercised due diligence" in conducting its investigation and providing notice to relatives. (§ 358, subd. (b)(2).)

## B.  *SSA's Due Diligence and Lack of Prejudice*

At the outset, we note Mother points to no express findings made by the court regarding SSA's due diligence. It also does not appear that she raised any objection regarding SSA's due diligence in the proceedings below. Assuming she did not forfeit the argument, we discern no error. There was evidence SSA asked Mother about any relatives who could provide support in December 2024, but Mother said she did not speak to any family members. SSA tried to gather more information, but Mother would not provide further details. In early January 2025, SSA asked Mother about relatives in Florida, and Mother reported they did not support her so she was not speaking to them. She also noted she would not allow Minor to have contact with any family members. Later in January 2025, SSA asked Mother and Minor's alleged father to identify any relatives interested in placement if reunification was unsuccessful. Both declined to relinquish any rights.

13

Around the same time, Mother provided the names of the maternal grandparents (her parents) and two of her siblings. She indicated she had no contact with the maternal grandparents since 2020 and also had no contact with her siblings. The record does not indicate whether contact information for any of these relatives was provided. SSA generally reported that it tried to collect information regarding relatives interested in placement for Minor and that it asked the parents and known relatives for names and locations of relatives. Given these facts, there was substantial evidence supporting the court's finding that SSA exercised due diligence.

*In re K.B.* (2023) 97 Cal.App.5th 689 (*K.B.*), which Mother cites, is inapposite. In *K.B.*, the county agency was in contact with relatives but failed to inquire of them about placement of the children. (*Id.* at p. 699.) The court accordingly reversed the juvenile court's due diligence findings and directed the juvenile court to order the agency to exercise due diligence in locating relatives and prepare a report describing its efforts. (*Id.* at p. 700.) Here, by contrast, SSA was not in contact with any relatives and could not obtain their contact information despite SSA's efforts to do so.

Even assuming any error, Mother has not established prejudice. She does not identify any relative who was willing and able to assume placement or provide support. The only relatives mentioned in the record are out-of-state grandparents, an aunt, and two uncles, and Mother herself expressed she did not want Minor to have contact with relatives. The statute does not presume relatives are available or appropriate, and we will not speculate as to whether any would have been suitable for placement. Because Mother has not carried her burden to show a reasonable probability of a more favorable outcome, any alleged deficiency in SSA's efforts is harmless.

14

## IV.

## SSA's ICWA Inquiry

Finally, Mother claims the court erred by finding ICWA did not apply because SSA did not satisfy its initial inquiry obligations under section 224.2, subdivision (b). The court did not err.

### A. *Relevant Background*

The underlying petition attached a judicial council form ICWA-010(A), which stated SSA questioned Mother and Minor "about the child's Indian status." The inquiry "gave [SSA] no reason to believe the child is or may be an Indian child."

According to SSA's jurisdiction/disposition report, the following relatives denied having Native American ancestry: Minor, Mother, and Minor's alleged father. SSA noted: "the family has not provided any other family member names to the undersigned in order for . . . [SSA] to continue to inquire as to ICWA."

Other SSA reports noted SSA "asked . . . [M]other about any relatives that may be able to provide support" in December 2024. Mother "stated she . . . ceased all communication with all family members." SSA "attempted to gather more information on this statement, but . . . [M]other would not provide any further details." In early January 2025, Mother stated she had no family. SSA asked about relatives in Florida, and Mother "reported her family did not support her, so she and [Minor] are not speaking to them." She also indicated she would not allow Minor to have any contact with any family members. Later in January 2025, SSA asked Mother and Minor's alleged father to identify any relatives interested in placement if reunification was unsuccessful. Both declined to relinquish any rights. Around the same time, Mother provided the names of the maternal

15

grandparents and two of her siblings. She indicated she had no contact with the maternal grandparents since 2020 and also had no contact with her siblings. The record does not indicate whether contact information for any of these relatives was provided or whether SSA made contact with them.

SSA generally reported that it attempted to collect information regarding relatives interested in placement for Minor and that it asked the parents and known relatives for names and locations of relatives.

In conjunction with the dispositional findings, the court found ICWA did not apply.

## B. *Applicable Law and Standard of Review*

The juvenile court and the county welfare department (here, SSA) "have an affirmative and continuing duty to inquire whether a child" who is the subject of a dependency petition "is or may be an Indian child." (§ 224.2, subd. (a).) The duties imposed by ICWA on the juvenile court and a county welfare agency can be separated into three phases: (1) a duty to inquire; (2) a duty of further inquiry if there is a "reason to believe" an Indian child is involved; and (3) a duty to provide ICWA notice once it is known or there is a "reason to know" an Indian child is involved. (*In re D.F.* (2020) 55 Cal.App.5th 558, 566–567.)

The initial duty of inquiry includes "asking a party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (b)(1).) When the child is placed in temporary custody, the county welfare department has a duty to inquire whether the child may be of Native American ancestry. (*Id.*, subd. (b)(2).) "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether

16

the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (*Ibid.*) "Extended family members" include the child's grandparents, aunts, uncles, siblings, brothers-in-law, sisters-in-law, nieces, nephews, first or second cousins, and stepparents. (§ 224.1, subd. (c)(1).)

The latter inquiry does not require questioning every single extended family member. (*In re H.B.* (2023) 92 Cal.App.5th 711, 720.) "'[T]he key' question on appeal 'should be whether the ICWA inquiry conducted has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding "is or may be an Indian child."'" (*In re E.W.* (2023) 91 Cal.App.5th 314, 322.)

A court's finding "that ICWA does not apply implies 'that social workers had fulfilled their duty of inquiry.'" (*In re Dominick D.* (2022) 82 Cal.App.5th 560, 567; see § 224.2, subd. (i)(2).) A juvenile court's finding that ICWA does not apply is reviewed for substantial evidence. (§ 224.2, subd. (i)(2).) And a "juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1141.) "'"On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes."'" (*Ibid.*)

C.  *SSA's Inquiry*

Here, the record supports the court's finding that ICWA did not apply and its implied finding that SSA conducted an adequate inquiry. SSA asked the only available family members—Mother, the alleged father, and

17

Minor—about Native American ancestry. Each of them denied having any such ancestry. Mother also declared this in her ICWA-020 form. Mother suggests SSA was required to inquire further because she mentioned her parents and two brothers while Minor mentioned a maternal aunt in conversations with SSA. But mentioning relatives, without more, does not obligate SSA to locate and interview them. Mother provided no contact information and no leads by which SSA could reasonably locate them, and the relatives lived out of state. Mother also reported that she did not have any contact with them.

Mother similarly argues SSA did not take any steps to identify a paternal relative. Not so. According to a jurisdiction/disposition report, SSA asked both parents for the names and locations of relatives. The court also ordered both parents to disclose the names, residences, and identifying information of any relatives to SSA. The record contains no indication that Mother or the alleged father provided the relevant information for any relatives. "'Where . . . a parent largely fails . . . to provide names and contact information for extended family members, [the Department's] ability to conduct an exhaustive ICWA inquiry necessarily is constrained.' [Citation.] '[W]e cannot ask the [Department] to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided.' [Citation.] Requiring the Department to track down information about extended family members beyond that offered by participants in the proceedings would impose an undue burden on the Department and necessarily reduce the resources it has to otherwise protect the welfare of dependent children." (*In re H.B.*, *supra*, 92 Cal.App.5th at p. 720.)

18

In short, the court did not err by determining SSA conducted an adequate inquiry sufficient to continue through disposition.

DISPOSITION

The orders are affirmed.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.